# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEWAYNE RETTIG, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:16-338 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

## I. Introduction

Pending before the court is a motion for summary judgment filed by the United States (the "government" or "United States") against plaintiff Dewayne Rettig ("Rettig" or "plaintiff"). (ECF No. 34.) In his complaint, Rettig alleges that the United States negligently exposed him to *Legionella* bacteria through the potable water system at the Veterans Affairs University Drive hospital (the "VA Hospital") in 2010. Rettig seeks monetary damages pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§2671 and 1346(b)(1). Because plaintiff's claim is time barred, the government's motion for summary judgment will be granted.

## II. Factual Background

In his complaint, Rettig alleges that he visited the VA Hospital for routine medical care on August 10, 2010, August 17, 2010, and August 30, 2010. (Compl. (ECF No. 1) ¶ 21.) During each of these visits, Rettig drank from the hospital's water fountains and filled a water bottle from those fountains to drink while he was waiting. (Id.)

On September 16, 2010, Rettig awoke with a 104 degree temperature and began coughing up blood. (Id. ¶ 23.) He sought treatment for his symptoms at the VA Hospital, where he was admitted to the intensive care unit and quarantined for approximately eight days. (Id.) His physicians informed him that he was suffering from Legionnaires' disease and speculated that he might have contracted the disease while on a recent vacation in Mexico. (Deposition of Dewayne Rettig ("Rettig Depo.") (ECF No. 38-2) at 74.)

Between January 2011 and October 2012, there was a highly-publicized outbreak of Legionnaires' disease associated with VA Hospitals in the Pittsburgh area. (Joint Statement of Material Facts ("J.S.M.F.") ¶ 2 (ECF No. 43).[1] See, e.g., Schultz v. United States, No. 15-454, 2017 WL 635289, at *5 (W.D. Pa. Feb. 16, 2017) (discussing the Legionnaires' disease outbreak at the VA Hospital in Pittsburgh). Between November 2012 and May 2013, the Pittsburgh media ran over one hundred stories reporting on the number of patients who had contracted Legionnaires' disease after receiving treatment at area VA hospitals. (J.S.M.F. (ECF No. 43) ¶ 4.) The press widely reported that the Center for Disease Control ("CDC") and a Congressional panel were conducting investigations to determine the source of the outbreak. (Id.) These stories also discussed the possibility that VA personnel had taken steps to cover up the outbreak. (Id.)

---

[1] Rettig responded to each of the government's Concise Statements of Material Fact with boilerplate, generalized denials to the effect that the referenced deposition testimony and exhibits: "speak for themselves"; "state[] conclusions of law to which no response is required"; or that "the weight and credibility to be given to a witness' testimony is the arena for the jury." (J.S.M.F. (ECF No. 43) ¶¶ 1-5.) As this court has previously noted, Local Rule 56.C requires an opponent's Responsive Concise Statement to "set forth the basis for the denial . . . with appropriate reference to the record . . . ." Schultz, 2017 WL 635289, at *2-3 (noting that a plaintiff is required "to respond specifically and in detail, with citation to actual evidence of record to show genuine disputes of material fact."). Failure to respond in this manner warrants the "severe consequence[]" of having those disputed facts deemed admitted. Id. at *3 ("Any alleged material facts 'set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied . . .'") (citing L. Cv. R. 56.E). In light of Rettig's failure to properly deny any of the material facts offered by the government, the government's statement of material facts will be deemed admitted. Id. at *3 ("Plaintiff's improper boilerplate responses result in the vast majority of [the government's] CSMFs being deemed admitted."). The court will consider, however, whether any properly supported averments in Rettig's own Statement of Material Facts are sufficient to preclude summary judgment.

According to Rettig, he never considered the possibility that he might have contracted Legionnaires' disease at the VA Hospital until a reporter from the Pittsburgh Tribune Review telephoned him in 2014 and asked him to do an interview. (Rettig Depo. (ECF No. 38-2) at 74.) The reporter explained that he had received an anonymous phone call from someone at the VA Hospital asking him to check into Rettig's situation because Rettig had "caught Legionnaires over there and they swept [him] so far under the carpet that they forgot about [him]." (Id. at 76.) Prior to that conversation, Rettig "didn't have any doubt" that he had contracted Legionnaires' disease while in Mexico, as his doctors had informed him. (Id. at 74.) He admitted that he heard reports in 2011 and 2012 about the *Legionella* outbreak at the VA Hospital but "didn't pay a whole lot of mind to it because it was two years after [he had contracted Legionnaires']" and so he "didn't put two and two together." (Id. at 81.) He also testified that he did not regularly read the newspaper or watch the news. (Id. at 74.)

Rettig's wife, Mary, learned about the *Legionella* outbreak at the VA Hospital in late fall of 2011 – about "one year" after her husband was diagnosed. (Deposition of Mary Rettig ("M. Rettig Depo.") (ECF No. 35-2) at 60.) She recalled seeing news stories on television and in the local press reporting that the VA Hospital was firing employees because they had covered up a *Legionella* outbreak at the hospital. (Id.) She characterized the outbreak as a "huge" story in the area. (Id.) At some point in late 2011, Mary told her husband that: "[T]he VA is hiding the fact that people have Legionnaires. They try to tell you you got it in Mexico. If you look at the gestation period of when it starts to peak, there is no way that happened." (Id. at 61.) According to Mary, neither she nor her husband had ever believed the hospital's explanation because it "did not make sense that he got it in Mexico." (Id. at 143.)[2]

---

[2] Mary Rettig also testified that she received an anonymous phone call from a nurse at the VA Hospital alerting her to the fact that her husband had contracted Legionnaires' from the water at the hospital and explaining that the

3

Throughout 2011 and 2012, Rettig frequently debated the potential source of his exposure to *Legionella* with his friends and family. A close friend, Robert Lane ("Lane"), stated that Rettig and he discussed the source of Rettig's disease "all the time." (Deposition of Robert Lane ("Lane Depo.") (ECF No. 35-4) at 36.) Lane recalled Rettig speculating that it "was at the VA's, could have been a water fountain, could have been ductwork, all kind of stuff." (Id.)

Rettig's brother recalled that the family "started to have a better handle" on how Rettig might have contracted the disease after the stories about the *Legionella* outbreak at the VA Hospital appeared on the news in 2011 and 2012. (Deposition of David Rettig ("D. Rettig Depo.") (ECF No. 35-5) at 56.) David described the outbreak as "a land mine going off around here with all the news reports and the Legionnaires' disease that was being contracted by veterans in the VA Hospital, the hospital that [Rettig] was in." (Id. at 56-57.)

Rettig's son, Karl, stated that "once the stuff [about *Legionella* at the VA Hospital] started coming out on the news," the family "kind of had the idea" that his father "may have got it from the VA Hospital considering there were so many cases of it." (Deposition of Karl Rettig ("K. Rettig Depo.) (ECF No. 35-6) at 26-27.) He spoke to his dad "a few times" in 2011 and 2012 about the *Legionella* outbreak at the VA and what might have caused it. (Id. at 28.) Karl stated that he thought it was "very damning" that "a lot of guys from the VA Hospital were coming up saying, hey, I have Legionnaires disease . . . ." (Id. at 28.) Karl told his dad, "hey, you were at the VA before you . . . took your trip [to Mexico] and all that other stuff." (Id.) Rettig responded that it "could very quite possibly be that way." (Id. at 29.)

---

hospital had been covering it up. (M. Rettig Depo. (ECF No. 35-2) at 138, 141-42.) During her deposition, Mary stated several times that this phone call took place "during late 2011." (M. Rettig Depo. (ECF No. 35-2) at 138-41, 143.) She later filed an affidavit in which she explained that she had been confused by the questions at her deposition and that the phone call in question actually occurred 2014. (Affidavit of Mary Rettig ("M. Rettig Aff.") (ECF No. 39-3) ¶¶ 5-9.) For purposes of this motion, the timing of this phone call is not material because there is ample additional evidence in the record to support the conclusion that as a matter of law Rettig's claim accrued no later than 2012.

Rettig's daughter Nicole also discussed with him the possibility that his Legionnaires' disease might have stemmed from the VA Hospital. (Deposition of Nicole Rettig ("N. Rettig Depo.") (ECF No. 35-7) at 32.) She said that these conversations happened in 2010, when he first contracted the disease. (Id. at 33.)

On June 4, 2015, Rettig submitted an administrative claim for $750,000 to the VA Office of General Counsel for "Legionnaire's Disease contracted at the VA Hospital in Pittsburgh." J.S.M.F. (ECF No. 43) ¶ 1.) He cited "8/30/2010" as the "date and day of accident" and alleged that he "was diagnosed with Legionnaire's Disease in September, 2010 after many regular visits to the VA Hospital in Pittsburgh, Pennsylvania." (Id.)

### III. Procedural History

Rettig commenced this action on March 22, 2016. (ECF No. 1.) On January 13, 2017, the government filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 34.) Rettig filed a responsive brief on February 13, 2017 (ECF No. 38), and the government filed a reply brief on February 27, 2017. (ECF No. 41.) The government's motion is now fully briefed and ripe for review.

### IV. Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or

her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. Celotex Corp., 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Id. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

**IV. Discussion**

The FTCA provides that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. To bring a claim under the FTCA, a claimant must first file a claim with the administrative agency allegedly responsible for his injuries. 28 U.S.C. § 2675(a). Any such claim must be made "within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). Because Rettig filed his administrative claim on June 4, 2015, his claim is untimely if it accrued at any time prior to June 4, 2013.

6

"[F]ederal law, not state law, governs the determination of the often decisive question to answer for statute of limitations purposes of when a claim has accrued under the FTCA." Santos ex rel. Beato v. United States, 559 F.3d 189, 198-99 (3d Cir. 2009) (citing Miller v. Phila. Geriatric Ctr., 463 F.3d 266, 270 (3d Cir. 2006)). An FTCA claim does not accrue "until the injured party learns of both the fact of his injury and its cause." Zeleznik v. United States, 770 F.2d 20, 23 (3d Cir. 1985) (citing United States v. Kubrick, 444 U.S. 111, 117-18 (1979)). A claim's accrual is not postponed until the injured party discovers every fact necessary to bring his action; rather, the "crucial question in determining the accrual date for statute of limitations purposes [is] whether the injured party had sufficient notice of the invasion of his legal rights to require that he investigate and make a timely claim or risk its loss." Id. (citing Kubrick, 444 U.S. at 117-18). This is true even when the injured party may not yet be aware of a federal agency's involvement. Id. at 24 (holding that awareness of the defendant's involvement "is no longer relevant for the purposes of accrual of the statute of limitations") (citing Davis v. United States, 642 F.2d 328 (9th Cir. 1981), *cert denied*, 455 U.S. 919 (1982)).

There is ample evidence in the instant case showing that Rettig was aware of the potential connection between his *Legionella* infection and the VA Hospital by 2011 or 2012. Rettig's wife, children, siblings, and a family friend each testified that they discussed the *Legionella* outbreak at the VA Hospital with him during that timeframe. During the fall of 2011, Rettig's wife told him that the VA was "hiding" the fact that people treated there were catching Legionnaires' disease and that there was "no way" that he had contracted the disease in Mexico, as previously suspected. (M. Rettig Depo. (ECF No. 35-2) at 61.) Lane recalled speaking with Rettig "all the time" about *Legionella*, including the possibility that it might have come from "a water fountain" or "ductwork" at the VA Hospital. (Lane Depo. (ECF No. 35-4) at 36.) Karl

7

Rettig told his father in 2011 or 2012 that it seemed "very damning" that so many guys from the VA Hospital were contracting Legionnaires' disease, to which Rettig replied that it was "very quite possibl[e]" that the VA Hospital was the source of his infection. (K. Rettig Depo. (ECF No. 35-6) at 27-29.) Rettig's daughter, Nicole, had a similar conversation with him in 2010. (N. Rettig Depo. (ECF No. 35-7) at 32-33.)

Although Rettig testified that he did not watch the news much, he admitted that he became aware of news reports about *Legionella* at the VA Hospital in late November and December 2012, when the outbreak became a leading news item in the Pittsburgh area. (Rettig Depo. (ECF No. 38-2) at 80-82.) Rettig's concern over exposure to *Legionella* was so acute that he "never once had another drop of water in that hospital" after his discharge in 2010, despite his prior longstanding habit of routinely filling his water bottle at the hospital's water fountains. (Id. at 167-69.) In conjunction with the testimony of his family and friends, Rettig's testimony clearly reveals that he had received "sufficient notice" of the need to investigate the potential connection between the VA Hospital and his Legionnaire's disease by no later than the end of 2012. Zeleznik, 770 F.2d at 23 (citing Kubrick, 444 U.S. at 117-18).

Rettig responds that he did not "pay a whole lot of mind" to these reports and "didn't put two and two" together until he received the anonymous phone call from a reporter in 2014. (Rettig Depo. (ECF No. 38-2) at 81.) The accrual standard, however, is objective, rather than subjective, focusing on whether the plaintiff possessed facts which would enable "a reasonable person" to discover the cause of his injuries. Hughes v. United States, 263 F.3d 272, 275 (3d Cir. 2001) (quoting Barren by Barren v. United States, 839 F.2d 987, 991 (3d Cir. 1988)). A reasonable person who contracts a rare disease shortly before learning about a well-publicized outbreak of that disease at a location he frequently visits has certainly received ample notice of

8

the need to investigate with "reasonable diligence" to determine whether his own injuries stem from the same source. Id. at 277 (quoting Augustine v. United States, 704 F.2d 1074, 1078 (9th Cir. 1983)). Rettig's subjective failure to make this same connection, even if credited, is simply irrelevant. A reasonable factfinder could only conclude that Rettig had sufficient notice about his injury and its likely cause prior to June 4, 2013.

Rettig also suggests that the accrual date for his claim should be equitably tolled because he was "actively misled" by the government. In Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750 (2016), the Supreme Court held that a federal statute of limitations can be equitably tolled only when a plaintiff establishes two distinct elements: (1) that he has been pursuing his rights diligently, and (2) the circumstances that caused his delay were "both extraordinary *and* beyond [his] control." Id. at 756 (emphasis in original). Equitable tolling is an extraordinary remedy, and the court extends it "only sparingly." Hedges v. United States, 404 F.3d 744, 751 (3d Cir. 2005); see Santos, 559 F.3d at 197. The principles of equitable tolling do not extend to "garden-variety claims of excusable neglect." Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). A plaintiff may not avail himself of the benefit of equitable tolling "unless [he] exercised due diligence in pursuing and preserving [his] claim." Santos, 559 F.3d at 197 (citing Irwin, 498 U.S. at 96).

Rettig contends that the government actively misled him in two ways: by initially covering up the outbreak of *Legionella* at the VA Hospital, and by suggesting early on that he may have contracted his illness while on vacation in Mexico. With respect to the former, Rettig contends that VA officials "vigorously denied any wrongdoing and lied, under oath, regarding their role in, and the extent of, the Legionnaire's outbreak." (Pl. Br. in Opp. (ECF No. 38) at 7.) Rettig, however, failed to cite any evidentiary support for this general accusation. To the extent

9

that he may be referring to the CDC and Congressional investigations into allegations of improper conduct at the hospital, it is undisputed that those well-publicized investigations occurred between November 2012 and May 2013, over two years before plaintiff submitted his administrative claim to the VA. Indeed, Rettig admits that he was aware of the explosion of news coverage occasioned by those investigations. (Rettig Depo. (ECF No. 38-2) at 80-82.) Even if the VA Hospital took steps to "cover up" the outbreak, the record reflects that Rettig had already been alerted to that cover up by no later than May 2013. No reasonable factfinder could conclude otherwise. His failure to exercise reasonable diligence to determine whether his own infection fell within the scope of that cover up is fatal to his request for equitable tolling. Santos, 559 F.3d at 197 (noting that a plaintiff must exercise "due diligence in pursuing and preserving [his] claim" in order to benefit from equitable tolling) (citing Irwin, 498 U.S. at 96).

Rettig fares no better with his contention that his physicians mislead him by initially suggesting that he may have contracted Legionnaires' disease while on vacation in Mexico. There is nothing in the record to suggest that anyone at the VA hospital was aware of the *Legionella* outbreak at the time of Rettig's initial diagnosis. Rettig's wife testified that she and her husband had already rejected his physicians' explanation by no later than 2011, stating: "[T]he VA is hiding the fact that people have Legionnaires. They try to tell you you got it in Mexico. If you look at the gestation period of when it starts to peak, there is no way that happened." (M. Rettig Depo. (ECF No. 35-2) at 61.) Rettig's numerous discussions with family and friends in 2011 and 2012 also caused him to question whether his illness was "very quite possibly" caused by exposure to *Legionella* bacteria at the hospital, rather than during his trip to Mexico. (K. Rettig Depo. (ECF No. 35-6) at 29.) Despite his reservations, Rettig failed to conduct any investigation to determine whether his illness was connected to the well-publicized

10

*Legionella* outbreak at the same hospital where he had recently sought treatment. Rettig's lack of "due diligence in pursuing and preserving [his] claim" again precludes him from utilizing the "extraordinary remedy" of equitable tolling. Santos, 559 F.3d at 197 (citing Irwin, 498 U.S. at 96). No reasonable factfinder could conclude to the contrary.

In short, the court concludes that Rettig's claim against the VA Hospital accrued well before June 4, 2013, and that equitable tolling is not warranted. No reasonable jury could conclude otherwise on the record presented herein. As such, summary judgment will be granted in favor of the government and against Rettig based on Rettig's failure to file his administrative claim within the applicable statutory limitations period.

## V. Conclusion

For the foregoing reasons, the government's motion for summary judgment will be granted. An appropriate order follows.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated: August 24, 2017

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEWAYNE RETTIG,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | Civil Action No. 2:16-338 |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

AND NOW this 24th day of August, 2017, upon consideration of the United States of America's motion for summary judgment, IT IS HEREBY ORDERED that for the reasons set forth in the accompanying memorandum opinion, the United States of America's motion (ECF No. 34) is **GRANTED**. Judgment is hereby entered in favor of the United States of America and against Dewayne Rettig.

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge